AETNA LIFE INSURANCE COMPANY, a corporation, Plaintiff and Appellee,

v.

R.J. McELVAIN, Jr. and Wilma M. McElvain, a/k/a Wilma McElvain, husband and wife, and Roland L. McElvain and Janie McElvain, husband and wife, Defendants,

and

Ronald D. Shepherd and Ramona Shepherd, husband and wife, and Ralph L. Shepherd and Virginia V. Shepherd, husband and wife, Defendants and Appellants.

No. 14484.

Supreme Court of South Dakota.

Argued Oct. 23, 1984.

Decided Feb. 13, 1985.

Richard A. Pluimer of Carr, Zastrow & Pluimer, Belle Fourche, for plaintiff and appellee.

Thomas E. Graslie, Buffalo, for defendants.

Ira D. Eakin of Huntley & Eakin, P.C., Baker, Montana, for defendants and appellants; William E. Anderson, Belle Fourche, on brief.

HENDERSON, Justice.

## ACTION

This is a mortgage foreclosure action. By final judgment dated December 5, 1983, the trial court reaffirmed its previous grant of a motion for summary judgment by appellee Aetna Life Insurance Company (Aetna), from whence this appeal is taken. We affirm.

## FACTS

Shepherds (appellants) were at one time the owners of the Box Elder Ranch, a large ranch which spreads into Montana, North Dakota, and South Dakota. In August 1978, Shepherds entered into an agreement with a Montana real estate sales agency known as Ranch Mart, whereby Ranch Mart would procure a buyer for the Box Elder Ranch.

The McElvains (appellees) showed an interest in purchasing the ranch, and the Shepherds agreed to sell for $1,235,000. In addition, McElvains were to purchase some machinery for an additional $150,000.

In May 1979, the two parties entered into a Buy/Sell Agreement pertaining to the ranch for a stated purchase price of $1,385,000 "payable as follows: One Million One Hundred Thousand in cash at closing by securing new Atena [sic] Ins. loan and cash to balance." McElvains arranged to obtain financing from Aetna who, as it was understood by all parties, would have a first mortgage on the property. The remainder of the selling price would be secured by promissory note and second mortgage written in favor of the Shepherds.

After receiving an appraisal of the Box Elder Ranch, Aetna approved a loan in the amount of $1,550,000. A letter to this effect was sent to McElvains confirming the above amount. A copy of this letter was received by Ranch Mart.

On June 29, 1979, McElvains executed mortgages in favor of Shepherds in the amount of $135,000. These mortgages were not recorded. On August 2, 1979, McElvains executed mortgages in favor of Aetna totaling $1,555,000, which were duly recorded. One mortgage concerned 3,265 acres in Fallon County, Montana, in the amount of $664,000 and was dated August 2, 1979; another mortgage applied to 4,854 acres in Harding County, South Dakota, and was in the amount of $751,000 bearing a date of August 2, 1979; a third mortgage covered 718 acres in Bowman County, North Dakota, which was in the amount of $140,000 and was likewise dated August 2, 1979. At the time the mortgages were executed, Aetna had disbursed only a portion of the funds to McElvain. As a result, Aetna later requested that the Shepherds file satisfactions of mortgages. This was

done, and on February 20, 1980, Shepherds filed new mortgages otherwise identical to the previous ones. The mortgages to Shepherds all recite that Shepherds' mortgage is junior and subordinate to Aetna's.

McElvains defaulted on payments to both Aetna and Shepherds. Shepherds foreclosed on their Montana mortgage and purchased the Montana portion of the ranch at Sheriff's sale, taking possession after the redemption period passed. Aetna commenced this foreclosure action in August 1981. Subsequent to the filing of the instant lawsuit, the Shepherds executed releases in favor of the McElvains in exchange for the McElvains' execution of quitclaim deeds to the property and in exchange for McElvains' redemption rights to the property.

In answer to Aetna's complaint, Shepherds alleged that a fraud had been committed upon them by Aetna's agents. Aetna moved for summary judgment, which motion was granted by the trial court. We separately treat three issues below deeming they are dispositive of this appeal.

## DECISION

### I.

DID THE ALLEGATION OF FRAUD CONTAINED IN SHEPHERDS' ANSWER RAISE A GENUINE ISSUE AS TO ANY MATERIAL FACT THEREBY PRECLUDING A SUMMARY JUDGMENT?

Shepherds allege they were defrauded when Aetna took a mortgage for $1,555,000 on the Box Elder Ranch, unbeknownst to them. Because of the language in the Purchase Agreement, Shepherds assumed the mortgage of Aetna would amount to no more than $1,100,000. As this was not the case, Shepherds' second mortgage has been rendered valueless. In light of the alleged fraud, Shepherds claim they are entitled to have the priority of their mortgage elevated above that of Aetna.

Shepherds advocate that they presented to the trial court a genuine issue as to whether a fraud had been perpetrated upon them. Because questions of fraud and deceit are generally questions of fact, *Commercial Credit Equip. Corp. v. Johnson*, 87 S.D. 411, 209 N.W.2d 548 (1973), Shepherds insist the trial court erred in granting summary judgment for Aetna. It is well established that summary judgment shall be granted where the pleadings, depositions, admissions on file, exhibits presented, and supporting affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. SDCL 15-6-56(a); *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 157 N.W.2d 19 (1968). When considering a motion for summary judgment, the formal issues presented by the pleadings are not controlling and a party may not rest upon the mere allegations contained therein. *Hughes-Johnson Co. v. Dakota Midland Hospital*, 86 S.D. 361, 195 N.W.2d 519 (1972).

The trial court found the following facts to be uncontroverted, based upon the record herein:

1) All the allegations of Aetna's Complaint had been admitted either by deposition or by written responses to Requests for Admissions.

2) At all times relevant to this action, Ranch Mart was acting as the exclusive agent of the Shepherds. The record confirms this fact. Ranch Mart's deposition reveals it represented none of the other parties in this sale. Ranch Mart is a real estate brokerage firm. Shepherds concede Ranch Mart was solicited to find a buyer for the Box Elder Ranch. In their brief, Shepherds define "broker" as follows:

> As generally defined, a broker is an agent who, for a commission or brokerage fee, bargains or carries on negotiations in behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the acquisition of contractual rights, or to the sale or purchase of any form of property, real or personal, the custody of

which is not entrusted to him for the purpose of discharging his agency.

12 Am.Jur.2d *Brokers* § 1, at 772 (1964).

3) The Shepherds, through their agent, Ranch Mart, had actual knowledge of Aetna's loan commitment to the McElvains prior to accepting the second mortgage from McElvains on June 29, 1979.

■ "The essential and basic feature underlying the relation of a broker to his employer is that of agency, and the principles of law applicable to principal and agent govern their respective rights and liabilities throughout...." 12 Am.Jur.2d *Brokers* § 30, at 795 (1964). "As against a principal both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." SDCL 59–6–5. The fact the knowledge was not actually communicated to the principal will not prevent operation of the general rule. 3 Am.Jur.2d *Agency* § 273 (1962).

Although he could not be sure when it was received, Wally Mading, of Ranch Mart, found a copy of the letter from Aetna's agent to the McElvains dated June 7, 1979, confirming approval of a loan in the amount of $1,550,000 in Ranch Mart's files. He further stated at deposition:

A. [I] am sure that I was aware that Aetna Life Insurance Company was going to be in a million and a half dollar mortgage position ....

    *    *    *    *    *    *

Q. You did know then that they were going to have a mortgage in excess of a million and a half dollars, and that their mortgage would be superior to the second mortgage of the Shepherds?

A. Yes, I am sure that I would have, I would have been aware of it just the way you said it.

■ 4) The Shepherds had constructive knowledge of the amount of Aetna's mortgage from and after August 2, 1979, and prior to the time Shepherds recorded their second mortgages.

Aetna recorded its mortgages on August 2, 1979. Though Shepherds had received their second mortgages prior to this time, they released those after the above date and received new second mortgages, which they filed in March 1980.

SDCL 44–8–10 provides: "The record of a mortgage, duly made, operates as notice to all subsequent purchasers and encumbrancers."

The matter of constructive notice is entirely a creature of statute and operates only to the extent contemplated by statute. The record of an instrument is not required in order to charge the parties thereto with notice of its contents, but by virtue of the recording laws it is in general held that the record is constructive notice to creditors and subsequent purchasers of such facts as they would have learned from the record, if examined, provided, of course, the instrument is one within the contemplation of the recording laws. It conclusively gives notice of its contents and legal effect.

The registration of a mortgage or deed of trust is constructive notice not only of the existence of the lien thus created, but also of the remedies accruing to the holder in event of default, by sale under the power contained in the instrument and by sale at foreclosure. The constructive notice furnished by a recorded instrument, so far as every material fact recited therein is concerned, is equally as conclusive as would be actual notice acquired by a personal examination of the recorded instrument or actual notice acquired by or through other means.

66 Am.Jur.2d *Records and Recording Laws* § 145, at 429 (1973). Thus, it flows that Shepherds are charged with constructive knowledge of the contents of the Aetna mortgage, which would show, upon review, a mortgage in the amount of $1,555,000.

■ 5) The Shepherds' second mortgage recites and acknowledges the priority of the first mortgage in favor of Aetna precluding, in light of the previous facts, Shep-

herds from denying the existence and priority of the first mortgage as a matter of law.

In light of these undisputed facts, it is clear that the allegations of fraud must fail as a matter of law. The summary judgment was properly granted as a matter of law.

■ It is further noted that upon receipt of a quitclaim deed, recorded with the Harding County Register of Deeds on May 31, 1983, from the McElvains, Shepherds filed a release of the mortgage on the South Dakota property. That release stated in part:

That the undersigned, being of lawful age, for the sole consideration of the transfer of that certain real property, more particularly described on Exhibit A attached hereto, to the undersigned by quit claim deed, receipt whereof is hereby acknowledged, do hereby discharge Roland L. McElvain & Janie McElvain, husband & wife, and R.J. McElvain, Jr. & Wilma McElvain, husband & wife, and their heirs, executors, and administrators of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now have or which may hereafter accrue on account of the sale or financing of the above described real property or of that certain real property located in the State of Montana, County of Fallon, commonly known as the Box Elder ranch. Said sale having occurred on or about the 29th day of June 1979. No other persons, firms, or entities other than those expressly mentioned above are in any way released by this document.

The trial court found, and properly so, that the above release acted as a legal satisfaction of the second mortgage upon which Shepherds base their affirmative defense as a matter of law. Shepherds' reliance on *Perry v. Perry*, 53 S.D. 585, 221 N.W. 674 (1928), is misplaced. That case held there was no merger of lien and title upon conveyance of the property to the mortgagee

in the case of *intervening* liens. "It is only when the fee and the lien center in the same person without any intervening claims, liens, or equities that a merger of the title and the lien will take place." *Perry*, 53 S.D. at 587, 221 N.W. at 675 (citations omitted). Aetna's lien, in the present case, was a prior lien, of which Shepherds had knowledge. *Perry* noted the fact that there was no knowledge of the intervening judgment lien at the time the deed was taken.

■ We conclude that Shepherds had both actual and constructive notice of the amount of the loan and the extent of the mortgage, thus precluding any reliance on fraud or misrepresentations. Therefore, the trial court did not err in its grant of summary judgment.

## II.

### DID SHEPHERDS' CLAIM OF STATUTORY VENDOR'S LIEN RAISE AN ISSUE OF LAW PRECLUDING A JUDGMENT IN FAVOR OF AETNA?

Shepherds concede in their brief that a decision on this issue must be predicated on determining that Shepherds were defrauded. In light of our holding on the issue of fraud, we deem it unnecessary to develop this issue.

## III.

### WAS AETNA ENTITLED TO THE APPOINTMENT OF A RECEIVER TO TAKE POSSESSION OF THE PROPERTY AND COLLECT THE RENTS AND PROFITS FROM THE MORTGAGED PREMISES DURING THE PERIOD OF STATUTORY REDEMPTION?

Shepherds, as successors to the redemption rights of McElvains via the conveyance and as mortgagees in possession, claim entitlement to the rents and profits from the land during the period of redemption and possession thereof, based upon *Knudson v. Powers*, 56 S.D. 613, 230 N.W. 282 (1930). *Knudson* held that a purchaser is not enti-

tled to possession of the property until after the expiration of the period of redemption. Until that time, the right of possession remains in the mortgagor and carries with it the right to rents and profits. McElvains assigned their right of possession to Shepherds; hence, they claim a right to rents and profits.

However, in *First Federal Sav. & Loan v. Clark Inv. Co.,* 322 N.W.2d 258 (S.D. 1982), this Court held that a mortgagor can contract away its right to rents and profits. The South Dakota mortgage from McElvains to Aetna recites as follows:

As further security for payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, Mortgagors hereby transfer, set over and assign to Mortgagee;

a. ... all government crop allotments associated with the premises.

\* \* \* \* \* \*

c. All other rents, issues and profits of the premises from time to time accruing, whether under leases or tenancies now existing or hereafter created, reserving to Mortgagors, however, so long as Mortgagors are not in default hereunder, the right to receive and retain such rents, issues and profits.

*First Federal,* 322 N.W.2d 258, held that an assignment of rents and profits was enforceable from the time of default until the foreclosure extinguishes the debt and thereby satisfies the assignment clause. However, in 1983, SDCL 21-47-17 was amended by adding: "However, a foreclosure may not be considered to be satisfaction of an assignment of rents agreement under the mortgage." This would indicate that an assignment of rents and profits on non-homestead property is now valid and enforceable from the time of default until the end of the period of statutory redemption.

SDCL 44-8-1.5 provides that "[n]o person whose interest is subject to the lien of a real estate mortgage may do any act which will substantially impair the mortgagee's security." The rights of the

Shepherds per the quitclaim deed can rise no greater than the rights of the McElvains. 23 Am.Jur.2d *Deeds* § 217 (1983). The Shepherds took the property subject to the mortgage of Aetna, and therefore, subject to the assignment of rents and profits contained in that mortgage. Aetna is entitled to the rents and profits through the redemption period.

Affirmed.

All the Justices concur.

WUEST, Circuit Judge, Acting as Supreme Court Justice, participating.